# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, ) | |
|     Plaintiff, ) | CR 11-00350-TUC-CKJ (JM) |
| ) | **REPORT AND RECOMMENDATION** |
| v. ) | |
| ) | |
| SALVADOR CRUZ-MEJIA, ) | |
| ) | |
|     Defendant. ) | |
| _____ ) | |

Pursuant to Order dated January 5, 2011, this matter was referred to Magistrate Judge Jacqueline Marshall for all pretrial matters. Defendant Salvador Cruz-Mejia filed a pretrial Motion to Suppress (Doc. 20). The Government responded to the motion on June 8, 2011 (Doc. 30). The Motion was heard by the Magistrate Judge on June 21, 2011. Defendant Cruz-Mejia was present and represented by counsel. The Government called two witnesses, Tucson Police Department ("TPD") Sergeant Art Esquivel and TPD Officer Patrick Pina. Defendant Cruz-Mejia called one witness, Mexley Martinez, and testified on his own behalf. The witnesses were sworn, examined and cross-examined. The Government offered 12 exhibits (Exhibits 1 through 12), all of which were admitted. Defendant Cruz-Mejia offered seven exhibits (Exhibits 22-23 and 25-29), all of which were admitted[1].

Having considered the matter, the Magistrate Judge recommends that Cruz-Mejia's Motion to Suppress be granted in part and denied in part. The Court submits the following Findings of Fact and Conclusions of Law.

---

[1] Trial is scheduled for August 23, 2011 at 9:30 A.M.

## I. FINDINGS OF FACT

On December 30, 2010, TPD officers responded to an address on 36th Street in Tucson in reference to a home invasion robbery call. (TR1 6-7.)[2] When Sergeant Esquivel arrived at the scene, several officers, including Officers Pina and Mesa, all of whom were wearing their regular patrol uniforms, were already there conducting an investigation. (TR1 7, 8, 44.) A female witness at the house informed Sergeant Esquivel and Officer Pina that she believed the intended target of the home invasion was another house on 36th Street, which she described as white in color with a golf cart and a trampoline in the front yard. (TR1 7-8, 41.)

With the information provided by the female witness, Sergeant Esquivel and Officers Pina and Mesa found the second house, located at 2014 East 36th Street, approximately seven houses down the street. (TR1 8, 23; Exh. 23.) The officers arrived at approximately 1:39 p.m. (TR1 66.) Sergeant Esquivel recalls that there was no fence between the road and the house and that he and Officer Pina "just walked up to the front door and just knocked," while Officer Mesa stood to the side of the door. (TR1 9-10.) Defendant Cruz-Mejia and his wife, Mexley Martinez, remember the situation differently. They testified that they were in the shower when Cruz-Mejia saw the officers arrive at the house. (TR2 88, 115.) Martinez recalls that Cruz-Mejia opened the bathroom window and an officer identified himself as from TPD and Cruz-Mejia, in Spanish, told the officer he would be right there. (TR2 88.) Martinez said that Cruz-Mejia then got out of the shower, she turned off the water and got out as well, and by that time they "noticed that the cops were already out in our living room because . . . we could hear . . . ." (TR2 88-89.) Cruz-Mejia then wrapped himself in a towel, told Martinez to stay in the bathroom and went out to talk to the officers. (TR2 89.) When he reached the front room of the house, he says the officers had already been allowed into

---

[2] "TR1" refers to Volume 1 of the Transcript re: Motion to Suppress Hearing dated June 21, 2011, and filed with the Clerk on June 24, 2011. (Doc. 37.) "TR2" refers to Volume 2 of the same transcript. (*Id.*)

the house by co-defendant Manuel Baron-Silva, a house guest who had allowed himself into the house while Cruz-Mejia and Martinez were in the shower. (TR2 114, 117.)

As Sergeant Esquivel remembers it, a man later identified as Defendant Cruz-Mejia, answered the door after he knocked and asked why they were there.[3] (TR2 129.) Sergeant Esquivel, speaking in Spanish, told him that the officers had information that there was illegal activity occurring inside the house and asked Cruz-Mejia if he would allow them inside. (TR1 11-12.) Cruz-Mejia, who was described as cooperative, "granted [the officers] access." (TR1. 13.) As Sergeant Esquivel described the encounter, "[w]e ask him if we can come inside, the door's already open, and we – and we walk in." (TR1 13.)[4] Officer Esquivel told Officer Pina, who is not fluent in Spanish, that they had permission to enter, and Officer Pina entered the residence followed by Officer Mesa. (TR1 63-64.)

The house was described as small, two bedroom with one bathroom (TR1. 16.), and after entering, Officers Pina and Mesa walked toward the back of the house toward the kitchen, while Sergeant Esquivel stayed by the front door. (TR1. 15.) Once inside, the officers noticed that there was another adult male in the house sitting on the couch, along with two or three children. (TR1. 14-15, 28.) Sergeant Esquivel asked Cruz-Mejia if there were any weapons or drugs inside the house and he indicated that there was a rifle behind the entry door to the house. (TR1. 15-16.) Officers then looked behind the opened front door and retrieved the rifle. (TR1. 16.) Cruz-Mejia was then asked if there were any other weapons in the house and he indicated that there were other handguns and another rifle in the bedroom and the couch area. (TR1. 17, 19.)

---

[3] Officer Pina recalled that two males opened the door (TR1 43.), and recalls that Cruz-Mejia was wearing only a bath towel (TR1 64.)

[4] On cross examination, Sergeant Esquivel, when asked how Cruz-Mejia's permission to enter was conveyed, stated, "I'm not sure exactly his body posture, but – but it was what we consider a voluntary consent to enter the residence." (TR1 26.)

At that point, Cruz-Mejia's wife, Mexley Martinez, who had been in the shower, came out into the living room. (TR1. 17, 46, 49.) Officer Pina explained why they were there, told her that Cruz-Mejia had indicated that there were additional weapons in the house and, speaking in English, asked her if she was on the lease for the house and if she would be willing to sign a consent to search form, and she said yes to both questions. (TR1. 17, 50.) Officer Pina retrieved a Spanish language consent form and presented it to Martinez. (TR1. 19-20; Exh. 1 (consent to search form).) The officer completed the form, allowed Martinez to review it and asked if she understood what she was reading. (TR1. 52.) Martinez indicated she understood and executed the form at approximately 2:00 p.m. (TR1. 19-20, 52-53, 66; Exh. 1 (consent to search).) Martinez indicated that she understood both English and Spanish. (TR1. 51.)[5]

Once the consent form was signed, Officers Mesa and Pina searched the residence while Sergeant Esquivel remained at the front door. (TR1. 20, 36, 53.) The officers retrieved and photographed the weapons that were in the couch area and from the back bedroom. (TR1. 20, 21-22, 54-55; Exhs. 2-12 (photographs).) Either just before, during or just after the search was conducted, the officers called for back-up assistance. (TR1 32, 36 (Sergeant Esquivel states that back-up was called after the weapons were discovered and secured); TR1 67 (Officer Pina states back-up was called just before or during the search).) After the weapons were located and secured, Sergeant Esquivel asked Cruz-Mejia to speak with him outside. (TR1. 22, 32, 36.) They both went outside where Sergeant Esquivel read him his *Miranda* rights in Spanish, and Cruz-Mejia indicated he understood and indicated he was willing to answer questions. (TR1 22.)

---

[5] Martinez testified that she signed the form only because the officers had already conducted the search and found all the weapons and she thought, "why not sign it." (TR2 92-93.)

- 4 -

## II. CONCLUSIONS OF LAW

### A. Initial Warrantless Entry

Without consent or exigency, police may not enter or search a home without first obtaining a warrant. *Payton v. New York*, 445 U.S. 573, 586 (1980); *United States v. Reid*, 226 F.3d 1020, 1025 (9th Cir. 2000); *United States v. Shaibu*, 920 F.2d 1423, 1425 (9th Cir. 1990). The Supreme Court has made it clear that whether a search or seizure involves persons or property, "the Fourth Amendment has drawn a firm line at the entrance to the house." *Payton*, 445 U.S. at 589-90. "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). It is undisputed in this case that there were no exigent circumstances and that Sergeant Esquivel and the officers accompanying him did not have a search warrant. The Government contends that consent was obtained prior to their entry into the residence and that they first obtained consent before searching the home.

Whether consent was given is generally a question of fact to be evaluated based on all the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 40 (1996); *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973). Consent may not be coerced, no matter how subtly. 412 U.S. at 228. In this case, the officers went to Cruz-Mejia's home to conduct an informal "knock and talk" interview of the residents. The Government relies solely on Cruz-Mejia's consent to support the legality of the officers' entry into the home. Under the circumstances here, it is well-established that "the government 'always bears the burden of poof to establish the existence of effective consent.'" *Shaibu*, 920 F.2d at 1426 (quoting *United States v. Impink*, 728 F.2d 1228, 1232 (9th Cir. 1984).

In this case, there is only one source of testimony describing what transpired at the door of Cruz-Mejia's home prior to the officers' entry. Officer Pina testified that he did not understand Spanish well and relied on Sergeant Esquivel. Both Cruz-Mejia and his wife, Mexley Martinez, testified that they were not at the door at the time the officers entered.

That leaves only the testimony of Sergeant Esquivel. Sergeant Esquivel testified that Cruz-Mejia, answered the door after he knocked and asked why they were there. (TR2 129.) Then, speaking in Spanish, Esquivel told him that the officers had information that there was illegal activity occurring inside the house and asked Cruz-Mejia if he would allow them inside. (TR1 11-12.) Cruz-Mejia, who was described as cooperative, "granted [the officers] access." (TR1. 13.) As Sergeant Esquivel described the encounter, "[w]e ask him if we can come inside, the door's already open, and we – and we walk in." (TR1 13.)

As a threshold matter, Cruz-Mejia and Mexley Martinez dispute the assertion that Cruz-Mejia answered the door and contend that it was co-defendant Barron-Silva who answered the door. However, if the officers reasonably believed that they were given consent by a third party, the entry is not unreasonable. *Illinois v. Rodriguez*, 497 U.S. 177, 186-88 (1990). Thus, even if the officers were mistaken in their belief that it was Cruz-Mejia who opened the door and allowed them entry, and it was actually Barron-Silva, there was no evidence presented that might establish that it was unreasonable to believe their entry was consensual. As such, Sergeant Esquivel's version of the encounter at the doorway, whether it involved Cruz-Mejia or Barron Silva, involved a claim of consent that must be evaluated.

In arguing that consent cannot be established under the facts of this case, Cruz-Mejia primarily relies on two Ninth Circuit decisions, *United States v. Shaibu*, 920 F.2d 1423 (9th Cir.), *amended*, 912 F.2d 1193 (1990), and *Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012 (9th Cri. 2008). In *Shaibu*, the police were searching for a man (not Shaibu) at an apartment complex, but they had the wrong address and, after pressing the buzzer at the front gate, and Shaibu responded by asking who was there. The police did not respond, but the gate release was activated and the officers proceeded to Shaibu's apartment. *Id*. at 1424. When the police walked into a hallway, Shaibu stepped out of his apartment. One of the officers identified himself and asked Shaibu if the man they were looking for was inside the apartment. Shaibu turned around and walked into his apartment, leaving the door open behind him. *Id*. Without asking permission to enter, the officers followed Shaibu into the

apartment where they found evidence that Shaibu was involved in bank fraud. The district court found that Shaibu had given an "implicit invitation" to enter and search the apartment when he walked inside and left the door open. *Id.* at 1425. The Ninth Circuit reversed, explaining that when police do not expressly request permission to search, consent may not be inferred.

The determinative difference between this case and *Shaibu* is that Sergeant Esquivel requested permission to enter. In *Shaibu*, the court expressly held that "[w]e will not infer both the request and the consent." 920 F.2d at 1428. Here, however, the Court does not have to infer that Sergeant Esquivel asked to be allowed inside– that was his testimony and there is no evidence to contradict his assertion. Thus, even though Sergeant Esquivel's description of the consent, that they were "granted access," is vague, the request to enter when coupled with the fact that the officers were allowed entry without objection from the person who opened the door, supports a finding of consent.

This conclusion is supported by the *Shaibu* court's discussion of *United States v. Griffin*, 530 F.2d 739 (7th Cir. 1976), where the court noted that the district court had relied on *Griffin* to support its finding that Shaibu had consented to the officer's entry into his apartment, and described the facts in *Griffin*:

> In *Griffin*, the police knocked on the door of an apartment where the defendant Griffin, and a co-defendant, Russell, lived. The police requested admission twice. The first time the police knocked, Russell came to the door and opened it, the police made a "request to be admitted into the apartment." Russell stated he was busy and "'slammed' the door in their faces." Soon thereafter the police knocked again, stated that they had reason to believe a burglary was in progress inside the apartment, and again asked to be admitted. Russell stepped back into the apartment, leaving the door partially open. Neither officer later recalled any words spoken by Russell during these moments. The officers entered the apartment and followed Russell down a short hallway into the living room.

*Shaibu*, 920 F.2d at 1426-27 (internal citations omitted). The court then distinguished *Griffin* from the situation presented in *Shaibu*, stating that:

> *Griffin* is dissimilar from the present case in two fundamentally significant respects. First, in *Griffin*, the police *requested entry*, in Shaibu's case they did not. Second, in *Griffin*, the Seventh Circuit interpreted the acts of opening the door and stepping back as responding affirmatively to a clear request by the police to enter the home. In Shaibu's case, no affirmative acts took place.

*Id*. at 1427 (emphasis in original). The facts of this case are closer to those in *Griffin* than those in *Shaibu*. The *Shaibu* court found it significant that the police in *Griffin* requested entry thereby allowing the court to interpret the act of opening the door and stepping back as an affirmative response to a clear request.

*Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012 (9th Cir. 2008), is similarly distinguishable. In that case, the court noted that there was no indication that the officers had make a request to enter before they pushed the door open to enter the residence. *Id.* at 1017; *see also United States v. Garcia*, 997 F.3d 1273 (9th Cir. 1993) (officer's request to talk, combined with defendant's affirmative response and step back gave rise to inference of consent). Unlike *Shaibu* and *Lopez-Rodriguez*, the evidence here indicates that Sergeant Esquivel did request entry into the home and that, at a minimum, entry was allowed without objection. As such, the Court finds the TPD officers entry into Cruz-Mejia's home was consensual.

### B.     Consent to search

Once inside the house, Sergeant Esquivel asked Cruz-Mejia if there were any weapons or drugs inside the house and he indicated that there was a rifle behind the entry door to the house. (TR1 15-16.) Officers then looked behind the opened front door and retrieved the rifle. (TR1 16.) Cruz-Mejia was then asked if there were any other weapons in the house and he indicated that there were other handguns and another rifle in the bedroom and the couch area. (TR1 17, 19.) Cruz-Mejia contends that the search for these weapons violated the Fourth Amendment and must be suppressed.

In relation to the first rifle found, Cruz-Mejia contends it was hidden behind the entry door and therefore did not fall within the plain view exception. Plain view can be the basis

for a warrantless seizure if the property seized was observed (1) from a vantage point where the viewing officer had the lawful right to be; and (2) the evidentiary value of the time was immediately apparent. *Horton v. California*, 496 U.S. 128, 136-37 (1990). However, moving something even a few inches constitutes a search and falls within the plain view exception only if the officer had probable cause to believe the thing being moved is evidence of a crime at the time he moved it. *Arizona v. Hicks*, 480 U.S. 321, 326 (1987).

As determined above, the officers involved in this case had obtained consent to enter the house and were therefore where they had a lawful right to be. Additionally, Sergeant Esquivel testified that Cruz-Mejia told them that there was a rifle behind the door and described the recovery of the rifle as follows:

> At that point we looked behind the door and without manipulating anything at all, the weapon was just leaning up against the wall in plain sight.

(TR1 16.) The Ninth Circuit has held that in situations such as this, officers are permitted to look in the area where evidence might be in plain view, but if anything needs to be moved, it does not fall under the exception. In *United States v. Washington*, 387 F.3d 1060 (9th Cir. 2004), for example, the court indicated that the defendant's admission that he possessed methamphetamine permitted the officers to look in the area indicated to see if the line was in plain view. *Id.* at 1071. That is precisely what occurred here, so the rifle found behind the door is not subject to suppression.

The discovery of the remainder of the weapons, however, required the officers to search the bedroom and sofa in the house and were therefore not in plain view. Cruz-Mejia and Mexley Martinez contend that the search for these weapons occurred prior to Martinez signing the consent to search. The officers contend that the search did not occur until after the consent form was signed, but the available evidence suggests otherwise. The question is whether the search was conducted before or after Martinez signed the consent form. As the evidence was presented in court, the Court finds that the search occurred *before* the consent form was signed.

Cruz-Mejia's argument on this point is straightforward. The officers uniformly testified that a back-up unit was called either just before, during or just after the search was conducted. (TR1 32, 36 (Sergeant Esquivel states that back-up was called after the weapons were discovered and secured); TR1 67 (Officer Pina states back-up was called just before or during the search).) During the hearing, defense counsel produced a transcript of the 911 tape associated with this case. (Exh. 29)[6]. Pages 3 through 5 of the transcript memorialize the communications between the officers involved in this case and TPD dispatch. The transcript reflects that officers arrived at Cruz-Mejia's house at 13:39, or 1:40 p.m. (*Id.* at 4.) The transcript then reflects several time entries related to each communication with dispatch. On page 5, the transcript reflects a time entry of "13:43," or 1:43 p.m., followed by a request for "a third unit" at Cruz-Mejia's address. (*Id.* at 5.) Thus, based on the testimony of Sergeant Esquivel and Officer Pina, when that call for back-up was made, the search was about to begin, was ongoing, or had been completed. However, the communication occurred 17 minutes prior to 2:00 p.m., the time when Mexley Martinez signed the consent form. This timeline was not rebutted in any way by the Government and is entirely consistent with Martinez's claim that she signed the consent form only because the officers had already conducted the search and found all the weapons and she thought, "why not sign it." (TR2 92-93.) Thus, the search was performed without consent.

"'Under the Fourth Amendment . . . evidence obtained subsequent to an illegal investigation is tainted by the illegality and thus inadmissible, notwithstanding . . . consent, unless subsequent events have purged the taint.'" *United States v. Bautista*, 362 F.3d 584, 592 (9th Cir. 2004) (quoting *United States v. Chavez-Valenzuela*, 268 F.3d 719, 727 (9th Cir. 2001), *amended by*, 279 F.3d 1062 (2002).) "To determine whether a prior illegality is sufficiently connected to the subsequent consent, we look to three factors: (1) the 'temporal

---

[6] Defense counsel obtained the 911 tape directly from TPD, from his own discovery efforts; it was not produced by the government. (TR2 144-145.)

proximity between illegality and consent;' (2) 'the presence of intervening circumstances;' and (3) 'the purpose and flagrancy of the official misconduct.'" *United States v. Washington*, 387 F.3d at 1073 (quoting *United States v. Chavez-Valenzuela*, 268 F.3d at 727-28).

The cases uniformly state that periods less than a few hours will not purge the taint of a prior illegal search. *See, e.g., Washington*, 387 F.3d at 1073 (citing cases finding two, six, and "only a few hours" insufficient to purge taint). Here, the temporal proximity between the illegality and the consent was approximately 17 minutes and does not serve to purge the taint of the illegal portion of the search. During this 17 minutes, there were no intervening circumstances that might serve to purge the taint. Martinez came out of the shower and was asked to sign a consent to search. Other than the search itself, little else happened. As to the flagrancy of the violation, it is patently apparent based on the timeline supplied by the defense and unrebutted by the Government that the officers could well have sought a warrant after they discovered the first rifle in plain sight, but elected instead to proceed with the search without first obtaining warrant and before obtaining consent. Nothing in these facts supports a finding that the taint of the illegal search was purged. As such, only suppression of the weapons, other than the rifle found in plain sight, will serve the "deterrence principle inherent in the exclusionary rule." *Washington*, 387 F.3d at 1077 (quoting *United States v. Ienco*, 182 F.3d 517, 526 (7th Cir. 1999).

### III. RECOMMENDATION FOR DISPOSITION BY THE DISTRICT JUDGE

Based on the foregoing, and pursuant to 28 U.S.C. § 636(b) and Local Rule 1.17(d)(2), Rules of Practice of the United States District Court, District of Arizona,

THE MAGISTRATE JUDGE RECOMMENDS that the District Court, after an independent review of the record, **grant in part and deny in part** Defendant Salvador Cruz-Mejia's Motion to Suppress (Doc. 20).

/ / /

/ / /

/ / /

Pursuant to 28 U.S.C. § 636(b), any party may serve and file written objections with the District Court within fourteen days of being served with a copy of this Report and Recommendation. If the objections are not timely filed they may be deemed waived. If any objections are filed, this action should use case number: CR 11-00350-TUC-CKJ.

DATED this 5th day of July, 2011.

*Jacqueline Marshall*
Jacqueline Marshall
United States Magistrate Judge